**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Sheniqua Bryant Carrasquillo, Individually and as Administrator of the Estate of Anibal Carrasquillo, Deceased,<br><br>Plaintiff,<br><br>v.<br><br>The City of New York, Correction Captain Jonathan Peters (Shield No. 423), Corrections Officer ("C.O.") Stephen Adams (Shield No. 19433), and C.O. Does 1-3.<br><br>Defendants | **COMPLAINT AND DEMAND FOR A JURY TRIAL** |

Plaintiff Sheniqua Bryant Carrasquillo ("Ms. Bryant Carrasquillo"), Administrator of the Estate of Anibal Carrasquillo ("Mr. Carrasquillo"), by her attorneys David B. Rankin of Beldock Levine & Hoffman LLP, as and for her complaint against Defendants, alleges as follows:

**PRELIMINARY STATEMENT**

1. This civil rights action seeks redress under 42 U.S.C. § 1983 for the injuries and death of the Plaintiff's husband, Anibal Carrasquillo, through the defendants' unconstitutional and unlawful conduct.

2. Plaintiff brings this action against the defendants whose conduct caused the substantial injuries and death of Plaintiff's husband while he was being detained at facilities of the City of New York Department of Correction ("DOC") on Rikers Island. Anibal Carrasquillo's death was caused by a pattern and practice within the

DOC, resulting in violations of the constitutional rights of those in DOC custody, and by the deliberate and willful indifference of DOC staff towards the safety and medical needs of individuals in custody.

3. On June 20, 2022, Mr. Carrasquillo died from a fentanyl overdose at the George R. Vierno Center ("GRVC") on Rikers Island.

4. At the time of his death, Mr. Carrasquillo had been detained at Rikers Island awaiting trial for 2 years, 8 months, and 22 days.

5. When entering custody, Mr. Carrasquillo reported to the Department of Correction that he used drugs daily, including heroin. While in custody, he was diagnosed with several mental health conditions, including substance use disorder, and required ongoing mental health treatment.

6. Days before his death, Mr. Carrasquillo was transferred to general population housing at GRVC, where people in custody are detained in cells alone.

7. The afternoon and evening before his death, Mr. Carrasquillo asked for medical attention and received none. In the early morning of June 20, 2022, Mr. Carrasquillo was found unresponsive with a faint pulse. He was found slumped over in his cell, blue in the face, with liquid coming out of his mouth and nostrils. Before this, no one had performed cell rounds on Mr. Carrasquillo in over 2 hours.

8. Narcan was eventually administered, but given the delay, Mr. Carrasquillo died from acute fentanyl intoxication.

9. The City of New York ("City"), and its agency the Department of Correction, have completely lost control of New York City's jails, making Mr. Carrasquillo's death the foreseeable result of their failures.

10. Officers' conduct that caused Mr. Carrasquillo's death is not out of the ordinary at New York City DOC jails, especially for individuals with mental illnesses and other health conditions. In the past several years, there have been numerous deaths due to refusal to provide medical care and adequate supervision.

11. The New York City Department of Correction ("DOC") also screens individuals for classification and housing and transfers between facilities. DOC is also responsible for the health and safety of people in its care and custody, such as Carrasquillo. When a person in custody has a medical need, DOC is responsible for protecting them and alerting correction staff and medical staff to their needs. Correction officers' duties include monitoring all people in custody to ensure their health and safety.

12. Former DOC Commissioner, Vincent Schiraldi, admitted that Riker's Island has "been at a crisis level for years," adding, "anybody who thinks that things were going well a year ago or two years ago . . . they're living in a dream world."

13. This crisis is not new. In November 2014, Mayor Bill DeBlasio hosted a roundtable to discuss much-needed reforms to Rikers Island, calling the multi-jail complex a "dehumanizing environment," which creates a "dynamic of conflict and violence" that has been "decades in the making."[1]

14. On April 14, 2022, the City of New York announced, in response to a contempt application, they were not in compliance with a court order mandating that they provide incarcerated individuals adequate medical care, and they claim providing legally mandated medical care is impossible. *Agnew et al. v. The New York City Department of*

[1] *See* "Mayor de Blasio Hosts Media Roundtable on Reform at Rikers Island Correctional Facilities," City of New York Office of the Mayor (November 20, 2014), available at https://www1.nyc.gov/office-of-the-mayor/news/932-14/transcript-mayor-de-blasio-hosts-media-roundtable-reform-rikers-island-correctional

*Correction*, 813431/2021E, Dkt. No. 121(Bx. Co. Sup. Ct. April 14, 2022).

15. Defendants, whose conduct caused substantial pain and suffering and death to Plaintiff's husband while he was being detained at the City of New York's jails on Rikers Island. A pattern and practice within DOC caused Mr. Carrasquillo's injuries, resulting in violations of the constitutional rights of those in DOC custody, and by the deliberate and willful indifference of DOC and HHC staff towards the medical needs of people in their care and custody.

16. Plaintiff seeks an award of compensatory damages, punitive damages, and attorneys' fees.

**JURISDICTION**

17. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), as this action seeks redress for the violation of the constitutional and civil rights of Plaintiff's husband.

**VENUE**

18. Venue is proper in the United States District Court for the Southern District of New York pursuant to 28U.S.C. § 1391(b)(2), as this is the judicial district in which the events giving rise to Plaintiff's claims took place.

**JURY DEMAND**

19. Plaintiff demands a trial by jury in this action on each and every one of her claims for which jury trial is legally available.

**PARTIES**

20. Plaintiff Sheniqua Bryant Carrasquillo is a resident of New York State and Kings County.

21. Plaintiff is the Administrator of the Estate of her husband, Anibal Carrasquillo ("Mr. Carrasquillo").

22. Mr. Carrasquillo was, at the time of the incident herein, a person detained pre-trial at Rikers Island in DOC custody.

23. Defendant the City of New York ("City") is and was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain the DOC, which acts as its agent in the area of corrections and for which it is ultimately responsible.

24. Defendants Correction Captain Jonathan Peters Shield No. 423, Correction Officer ("C.O.") Stephen Adams Sheild No. 19433, and Correction Officer Does 1–3 ("C.O. Does") (hereinafter collectively referred to as "Individual Defendants"), were acting under color of state law in the course and scope of their duties and functions as agents, servants, and employees of The City of New York and/or DOC and otherwise performed and engaged in conduct incidental to their lawful functions in the course of their duties. They were acting for and on behalf of The City and/or DOC at all times relevant herein, with the power and authority vested in them as agents and employees of The City of New York and DOC and incidental to their duties as agents and employees of The City of New York and DOC. They are sued in their individual capacities.

25. Defendants C.O. Does 1-3 were at all times relevant herein employees or agents of DOC and/or The City of New York They are sued in their individual capacities.

26. The true and complete names, ranks, and shield numbers of Defendants C.O.s Does are not currently known. However, they were employees or agents of The City of New York and/or DOC on the dates of the incidents. Accordingly, they may be entitled to

representation in this action by the New York City Law Department ("Law Department") upon their request, pursuant to New York State General Municipal Law § 50-k. The Law Department, then, is hereby put on notice (a) that Ms. Bryant Carrasquillo intends to name said officers as defendants in an amended pleading once their true and complete names, ranks, and shield numbers become known and (b) that the Law Department should immediately begin preparing their defense(s) in this action.

27. Individual Defendants' acts and omissions hereafter complained of were carried out intentionally, recklessly, or with malice, and/or a gross disregard for Mr. Carrasquillo.

## STATEMENT OF FACTS

28. Mr. Carrasquillo was a person living with several disabilities. He had several serious medical conditions and mental health disorders, including substance use disorder. Mr. Carrasquillo reported daily drug use, including heroin use, upon his admission to Rikers Island. Mr. Carrasquillo received mental health treatment throughout the 2 years and 8 months he spent at Rikers Island.

29. On June 17, 2002, Mr. Carrasquillo was transferred to GRVC to be placed in a general population housing unit where people in custody are detained in cells alone.

30. Individual Defendants Captain Peters, C.O. Adams, and C.O. Does 1–3 were on post in Mr. Carrasquillo's housing area at GRVC on June 19, 2022.

31. On the afternoon of June 19, 2022, Mr. Carrasquillo reported chest pain to C.O. Does and asked to be escorted to the clinic. C.O. Does did not escort Mr. Carrasquillo to the clinic or otherwise assist him.

32. Later that evening, after 10:00 PM, Mr. Carrasquillo complained to C.O. Adams that he did not feel well.

33. C.O. Adams left the unit unsupervised for ten minutes at approximately 9:00 PM.

34. After Mr. Carrasquillo complained that he did not feel well, C.O. Adams did not check on Mr. Carrasquillo for over 2 hours, despite the requirement that officers perform rounds and look into each individual cell every 30 minutes.

35. Captain Peters and C.O. Does did not check Mr. Carrasquillo either.

36. C.O. Adams abandoned his post on the housing unit two more times—first for 26 minutes and then for 16 minutes—leaving the entire unit unsupervised.

37. While locked in his cell, Mr. Carrasquillo began overdosing on fentanyl.

38. At approximately 12:54 AM on June 20, 2021, Captain Peters and CO Adams found Mr. Carrasquillo slumped forward facing his cell door. They opened the door, and Mr. Carrasquillo fell to the floor.

39. Captain Peters checked Mr. Carrasquillo's pulse and detected a faint pulse.

40. Narcan had to be retrieved from a separate location, and then it was administered.

41. Emergency Medical Services ("EMS") was eventually called.

42. After medical staff and EMS arrived, Mr. Carrasquillo was declared dead.

43. C.O. Does 1-3 were responsible for monitoring Mr. Carrasquillo's cell and other cells on the unit but did not.

44. On June 20, 2022, Mr. Carrasquillo died from acute fentanyl intoxication.

## FIRST CAUSE OF ACTION
**42 U.S.C. § 1983**
**(Deliberate Indifference)**
***Individual Defendants***

45. Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if set forth herein.

46. In committing the acts and omissions complained of herein, Defendants knew, were deliberately indifferent to, and/or recklessly disregarded the serious risk of harm to Mr. Carrasquillo.

47. In committing the acts and omissions complained of herein, Defendants acted under color of state law to deprive Mr. Carrasquillo of his constitutionally protected rights under 42 U.S.C. § 1983 and the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

48. But for Defendants' willful and deliberate indifference to the medical needs of Mr. Carrasquillo, he would not have experienced pain and suffering and, ultimately, death.

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983**
**(Monell Liability)**
***The City of New York / Department of Correction***

49. Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if set forth herein.

50. All of the acts and omissions of the named and unnamed individual defendants described above were carried out pursuant to overlapping policies and practices of Defendants City and DOC which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the City and DOC.

51. Defendants City and the DOC, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

52. The acts complained of were carried out by the aforementioned individual defendants in their capacities as correctional officers pursuant to customs, policies, usages, practices, procedures and rules of Defendants City and DOC.

53. The policies, practices, customs, and usages were a direct and proximate cause of the unconstitutional conduct alleged herein, causing injury and damage in violation of Mr. Carrasquillo's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth and Fourteenth Amendments.

54. The aforementioned customs, practices, procedures, and rules of Defendants City and DOC include, but are not limited to, the following unconstitutional practices:

    a.  Failure to provide adequate medical care for pretrial detainees in its custody;

    b.  Failure to properly train, screen, and supervise employees, and failure to inform the Incident Individual Defendants' supervisors of their need to train, screen, or supervise the Individual Defendants for their deliberate indifference to the serious medical needs of individuals in their custody;

    c.  Failure to make scheduled visual inspection of cells;

    d.  Failure to properly observe individuals in their cells who have are having a medical emergency;

    e.  Failure to ensure patients are produced for their medical appointments;

    f.  Failure to maintain a safe environment by following policies to intercept contraband introduced to the facility;

    g.  Failure to properly administer field tests to identify fentanyl.

55. Past and current litigation, department reports, and independent investigations have placed the City on notice as to the nature, causes, and persistence of deliberate indifference in the large multi-jail New York City DOC, and specifically at Rikers Island.

56. The problems at Rikers Island specifically are of such a magnitude that the City announced it intends to shut down the whole jail complex. In March of 2017, former Chief Judge Jonathan Lippman and then City Council Speaker Melissa Mark-Viverito stated that "Rikers Island is an affront to the civic values of New York City. Reforming our jail system and closing Rikers Island is not simply good public policy—it is a moral imperative."[2]

57. The New York Commission of Correction in *The Worst Offenders Report: The Most Problematic Local Correctional Facilities of New York State* named Rikers Island as one of the five jails that "pose[s] an ongoing risk to the health and safety of staff and inmates and, in instances, impose cruel and inhumane treatment of inmates in violation of their Constitutional rights." The commission found "numerous instances where a death was attributable to deficient medical care, substandard mental health services, or inadequate custody and supervision by security staff."[3]

58. The City has acted with complete and deliberate indifference toward these unconstitutional conditions and the suffering of the detainees forced to endure them, despite years of court-ordered reform, federal monitoring, thousands of individual

[2] *See* Jonathan Lippman and Melissa Marl-Viverito, *Closing Rikers Island Is a Moral Imperative,* NY Times (Mar. 31, 2017), https://www.nytimes.com/2017/03/31/opinion/closing-rikers-island-is-a-moral-imperative.html.

[3] Thomas Al. Beilein, Chairman of the New York State Commission on Correction, et al. *The Worst Offenders Report: The Most Problematic Local Correctional Facilities of New York State*, New York State Commission on Correction, 2–3 (Feb. 2018), available at https://scoc.ny.gov/pdfdocs/Problematic-Jails-Report-2-2018.pdf

lawsuits and multiple class actions, and extensive reporting about institutional failures contributing to the shocking conditions at the complex.

59. The deliberate indifference that caused Mr. Carrasquillo's death is not out of the ordinary at Rikers, especially for individuals with mental illnesses and other health conditions. Rather, a pattern and practice of deliberate indifference exists. Several entities, including the United States Attorney's Office for the Southern District of New York, the New York City Department of Health and Mental Hygiene, the New York City Department of Investigation, the New York Times, and the Associated Press have conducted major investigations, which have revealed patterns of abuse and neglect by DOC staff on Rikers Island. In the past several years, there have been numerous brutal deaths due to refusal to provide medical care and supervision. For example:

> i. Nicholas Feliciano attempted to commit suicide by hanging at a Rikers in November 2019 and sustained a serious brain injury. Correction officers watched him hanging for over 7 minutes. The City paid $28.75 million to settle the related lawsuits.[4]
>
> ii. Layleen Cubilette-Polanco died on June 7, 2019. Ms. Polanco died from an epileptic seizure at Rikers. She had been placed in solitary confinement, and corrections officers, who were supposed to check on her every 15 minutes, neglected to check on her for periods of up to 57 minutes. The City paid $5.9 million to settle a lawsuit regarding her death.[5]
>
> iii. Casey Holloway died at Rikers Island on July 9, 2018 after another person in DOC custody attacked him in the Mental Observation Unit where the two were housed. Mr. Holloway, who had asthma, struggled to breathe following the attack and collapsed, but he was not immediately taken to an infirmary or otherwise given medical attention and died later that day. The City settled a lawsuit

[4] Ransom, J., & Tiefenthäler, A. (2024, April 6). *New York City set to pay a record $28 million to settle Rikers Island Suit*. The New York Times. https://www.nytimes.com/2024/04/06/nyregion/nyc-rikers-negligence-lawsuit.html

[5] *Polanco v. City of New York*, 19-cv-4623 (S.D.N.Y.) (filed November 15, 2019); https://www.nytimes.com/2020/08/31/nyregion/layleen-polanco-settlement-rikers-transgender.html. Seventeen corrections officers, including one captain, were disciplined for their role in the tragedy; yet only four were suspended without pay. https://www.nytimes.com/2020/06/26/nyregion/layleen-polanco-rikers-transgender-death.html?action=click&module=RelatedLinks&pgtype=Article

regarding his death. *Holloway v. City of New York, et al.*, 1:19-cv-8344 (S.D.N.Y.).

iv. Joseph Foster died on December 30, 2017 in DOC custody from a brain hemorrhage. Mr. Foster was screaming in agony in his cell and begging for a doctor, but a jail captain took close to an hour to move Mr. Foster to the medical clinic.

v. Jairo Polanco Munoz committed suicide in DOC custody at the Manhattan Detention Complex on March 14, 2016 after being tossed in general population at intake, despite a history of serious mental illness and prior in-custody suicide attempt. In April 2015, during a prior detention at Rikers, Mr. Munoz attempted suicide by hanging while left alone in an intake cell. Staff had rescheduled a psychiatric assessment of Mr. Munoz for 3 days after his intake but cancelled the appointment due to a lockdown. On the date of the cancelled appointment, Mr. Munoz committed suicide by hanging and died alone in his cell. *Munoz v. City of New York*, 1:17-cv-4407 (NRB) (S.D.N.Y.).

vi. Angel Perez-Rios died on January 24, 2016 at Rikers Island. Mr. Perez-Rios repeatedly begged for stronger psychiatric medication to treat his mental health condition, but his appointments were cancelled. Mr. Perez-Rios was found hanging from his cell window by a noose made of shoelaces.

vii. Richard Gonzalez died in October 2015 in a holding cell at Rikers Island after gasping for air and convulsing on the floor. Captain Henry and others correction officers near the holding cell ignored his pleas for help and 90 minutes passed with no officer calling for medical help. The City settled a lawsuit regarding his death. *Carlson et al. v. City of New York et al.*, 17 Civ.172 (PAE) (S.D.N.Y.).

viii. Fabian Cruz died on January 1, 2015 in DOC custody. Mr. Cruz was referred to suicide watch, but suicide watch was never implemented. Mr. Cruz was found dead in his cell with a bed sheet tied around his neck.

ix. Christian Haley died on October 23, 2014 in the custody of the DOC. He died as a result of being transferred to a facility where his medical needs could not be met. See, *Fernandez, Gertrudys et al. v. City of New York, et al.*, 17 Civ. 2431 (GHW)(SN) (SDNY).

x. Victor Woods died on October 21, 2014 at Rikers. He was hemorrhaging internally. A DOC officer, while sipping from a coffee cup, watched this unfold. Mr. Woods then bled to death. The City settled a lawsuit regarding his death for $1.5 million.[6]

xi. Jerome Murdough, a homeless veteran, died on February 15, 2014 in a mental health unit at Rikers. He was locked in a 101-

[6] Jake Pearson, *Widespread Problems on Rikers Island Tough to Finally* Fix, Washington Post (Dec. 28, 2014), available at https://www.washingtonpost.com/politics/widespread-problems-on-rikers-island-tough-to-finally-fix/2014/12/28/b2a92e6c-8d2c-11e4-a085-34e9b9f09a58_story.html

degree cell for hours.  DOC officers ignored his pleas for help. The City paid $2.25 million to settle the lawsuit regarding his death.[7] A guard plead guilty on 2016 to falsifying business records to state that she had checked on Mr. Murdough.

xii.    Rolando Perez died in January 2014 at Rikers Island after suffering multiple seizures. He was put in solitary confinement without clearance from medical staff. Mr. Perez required seizure medication to control his seizure disorder. In solitary, Mr. Perez was screaming for his anti-seizure medication for his seizure disorder but was ignored. The City settled a lawsuit regarding his death.[8]

xiii.   Quanell Offley died at Rikers Island on December 3, 2013 days after hanging himself in his solitary confinement cell. Mr. Offley repeatedly told guards that he was suicidal. A guard dared Mr. Offley to "go ahead and do it."[9]

xiv.    Horsone Moore, a person detained with serious psychiatric needs, died on October 14, 2013 after hanging himself from the shower frame of his cell at Rikers Island. Mr. Moore attempted suicide several days before in Bronx Court holding pens and was referred to suicide watch. After being transferred to Rikers Island, staff never implemented the suicide watch. Mr. Moore unsuccessfully attempted suicide twice before a final third attempt left him dead.

xv.     Gilbert Pagan died in September 2013 by suicide. Mr. Pagan hung himself by placing the metal bedframe in his cell upright. In May of 2012, Jamal Polo also died by hanging himself using a metal bedframe he stood upright in his cell, which prompted a work order to secure all beds to the floor. In September 2013, the order had not been completed. It was not until after Mr. Pagan died that the work order had been completed.

xvi.    Bradley Ballard died on September 11, 2013 at Rikers. DOC staff watched him deteriorate for days in an observation unit, where he was deprived of medications for diabetes and schizophrenia and had no running water.  Mr. Ballard sexually mutilated himself and was found naked and covered in urine and feces.  The City paid $5.75 million to settle the lawsuit regarding

---

[7] Justin Worland, *$2.5 Million Settlement for Hot Jail Cell Death on Rikers Island*, Time (Oct. 31, 2014), available at https://time.com/3551713/rikers-hot-jail-cell-death-settlement/.

[8] Paula Mejia, *City Pays $3.5 Million to Family of Man Who Was Allegedly Denied Epilepsy Meds at Rikers*, Gothamist (May 1, 2019), available at https://gothamist.com/news/city-pays-35-million-to-family-of-man-who-was-allegedly-denied-epilepsy-meds-at-rikers.

[9] Jake Pearson, *Mom Sues After Suicidal Inmate Son Kills Himsself at Rikers*, NY Daily News (Feb. 11, 2015), available at https://www.nydailynews.com/sdut-mom-sues-after-suicidal-inmate-son-kills-himself-2015feb11-story.html.

his death.[10] *See Griffin v. City of New York, et al.*, 1:14-cv-7329 (NRB) (S.D.N.Y.).

xvii. Carlos Mercado died on August 24, 2013 at Rikers. Mr. Mercado experienced diabetic ketoacidosis. DOC officers ignored frantic pleas from others for help. When Mr. Mercado fell onto the floor of a cell, officers stepped over him. The City paid $1.5 million to settle the lawsuit regarding his death.[11]

xviii. Jason Echevarria died on August 18, 2012. Mr. Echevarria, an individual held on Rikers Island known to have a serious mental illness and prior suicide attempts in DOC custody, ingested toxic detergent, and then died after hours of begging for medical care and not receiving it. The DOC captain who ignored the pleas for help received a 5-year prison sentence for deprivation of rights under color of law through deliberate indifference. The City settled a lawsuit regarding his death for $3.8 million.[12] *See Echevarria v. City of New York et al*, 1:13-cv-4291 (RMB)(RLE) (S.D.N.Y.).

xix. Gregory Giannotta died from suicide on October 9, 2012. Mr. Giannotta hung himself from an improperly exposed water pipe in a bathroom. He was found to be at risk of suicide but not placed on watch or given psychotropic medications.

xx. Jamal Polo hung himself at Rikers Island in May 28, 2012 from a metal bedframe, which he placed upright in his cell. After his death, an order was prompted to secure all beds to the floor to prevent similar suicides but not completed until after a second person died a year later.

60. The foregoing incidences and the civil litigation arising from them have put the City and DOC on notice that the failure to monitor the individuals in their care and supervise, train, and discipline staff create a significant risk of death or serious injury.

---

[10] Weiser, Benjamin, *City to Pay $5.75 Million Over Death of Mentally Ill Inmate at Rikers Island*, New York Times (Sept. 27, 2016), available at https://www.nytimes.com/2016/09/28/nyregion/rikers-island-lawsuit-bradley-ballard.html.

[11] Michael Schwirtz, *City to Pay $5.3 Million to End Suits Over 2 Rikers Inmates' Deaths*, New York Times (Nov. 17, 2015), available at https://www.nytimes.com/2015/11/18/nyregion/rikers-inmate-jason-echevarria-wrongful-death-lawsuit-settlement.html.

[12] Department of Justice, United States Attorney's Office for the Southern District of New York, *Former Rikers Island Correction Officer Sentenced to Five Years in Prison for Deliberately Ignoring Urgent Medical Needs of Inmate Who* Died, (June 18, 2015), available at https://www.justice.gov/usao-sdny/pr/former-rikers-island-correction-officer-sentenced-five-years-prison-deliberately.

61. The DOC has in general failed to implement proper procedures to ensure individuals at Rikers receive medical attention. To the extent certain policies are in place, the DOC has failed to properly supervise and train officers to respond to medical needs.

62. Repeated litigation demonstrated the City's constructive acquiescence to the pattern of deliberate indifference to the physical and medical needs of people in DOC custody. Failure to adopt policies that provide for adequate care of individuals at Rikers, such as ensuring they receive medications, as well as the practice of deliberately not training or supervising employees to correctly to perform these duties, has resulted in the current state of frequent brutality and indifference at Rikers.

63. In the two years since Carrasquillo's death, DOC has failed to protect numerous others in its care and custody from overdoses and failed to respond to the serious medical needs of people in custody.

64. In 2022 alone, 18 people have died in custody on Rikers Island. In 2021, that number was sixteen.

65. A New York City Board of Corrections report regarding the deaths found that "

66. In a recently released New York City Department of Investigation ("report examining contraband smuggling in the City DOI references a series of undercover integrity tests performed in 2014 and 2018, where DOI investigators posed as DOC staff and entered DOC facilities with concealed narcotics or weapons that were undetected by front gate screening procedures. The DOI issued reports in 2014 and 2018 identifying vulnerabilities and recommending procedural changes to reduce the amount of contraband in City jails. One of the vulnerabilities was DOCDOC has not fully implemented many of the 2018 recommendations DOI issued.

67. The DOI recently released another report on the City, which identified several concerns about DOC DOI reported 3,026 people in New York City died by overdose in 2022revealed the presence of fentanyl was the most common controlled substance found in overdose deaths. The Board of Correction ( in 2022. Then-DOC Commissioner Louis Molina said the drugs were introduced to facilities in three ways: US mail, visitors, and correctional staff. In an October 2022 New York City Council appearance to discuss the rise of fentanyl in City jails, Molina discussed changes to the handling of incoming mail for people in custody, and introduced photographs of a love letter, a child, all flagged by mailroom officers as field-tested positive for fentanyl.

68. Both field test manufacturers used by DOC, Sirchie until April 2023, and then DetectaChem, explicitly instruct users to send any positive field tests for confirmatory laboratory testing. DOI obtained "drawing and t-shirt" previously field-tested positive for fentanyl, and sent them for confirmatory laboratory testing. None of the items tested positive for any controlled substances. DOI determined DOC has presented incorrect numbers of fentanyl recoveries to the media and its oversight bodies.

69. The DOI report concluded, " DOI found approximately 85% of the items sampled from DOC mail system, all previously field tested positive for fentanyl, tested negative after the required confirmatory laboratory testing.

70. Both recent DOI reports found DOC did not follow policies and procedures adequately, despite multiple reports providing specific recommendations over several years, in the areas of intercepting contraband and field testing for fentanyl.

71. The City recently to the court in *Nunez* that it "acknowledge[s] that the City is not where it wants to be in terms of the conditions of the City's jails, the levels of violence, or the

deaths in custody." In opposing the *Nunez* plaintiffs' call for a federal receiver to take over management of Rikers Island, the City emphasized the problems at Rikers Island were "deeply entrenched" and "decades-long." The City noted that the *Nunez* monitor found the current crisis at Rikers Island of the past two years "further destabilized a system that was already in crisis, one reeling from a poor foundation weakened by decades of neglect and internal and external mismanagement."

72. As a result of the aforementioned conduct of the City, DOC, and the Individual Defendants, Correction Captain Jonathan Peters, Correction Officer Stephen Adams, and Correction Officer Does 1-3, Carrasquillo's constitutional rights were violated, resulting in his extraordinary physical and emotional pain, suffering, and death.

**WHEREFORE**, Plaintiff demands judgment against the defendants individually and jointly and prays for relief as follows:

a. Compensatory damages;

b. Punitive damages;

c. The convening of a jury to consider the merits of the claims herein;

d. Pre- and post-judgment costs, interest, and attorney's fees; and

e. Such other further and different relief as to the Court may deem appropriate and equitable.

Dated: February 3, 2025
New York, New York

BELDOCK LEVINE & HOFFMAN, LLP
99 Park Avenue, PH/26th Floor
New York, New York 10016
212-277-5825
drankin@blhny.com

By:______________________________________
David B. Rankin

*Attorneys for Sheniqua Bryant Carrasquillo*